IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| LINDA R. HICKS<br>　　Plaintiff,<br><br>vs.<br><br>BAYLOR UNIVERSITY MEDICAL CENTER<br>　　Defendant. | §§§§§§§§§§§<br><br>CIVIL ACTION NO. 3:22-CV-72 |

# ORIGINAL COMPLAINT AND JURY DEMAND

COMES NOW, Linda R. Hicks (the "Plaintiff") and files this original complaint and jury demand against Baylor University Medical Center (the "Defendant"; "BUMC"), and alleges and avers as follows:

## NATURE OF THE ACTION

This is an action under Title I of the Americans with Disabilities Act of 1990 ("ADA") and the Age Discrimination in Employment Act ("ADEA") to correct unlawful employment practices on the basis of age and disability discrimination and to provide appropriate relief to Linda Hicks, RN ("Nurse Hicks") who was adversely affected by such practices. As alleged with greater particularity below, Plaintiff alleges that Defendant, Baylor University Medical Center, discriminated against Nurse Hicks based on her age and disability in violation of the ADA and ADEA by revoking her accommodation which had been approved and providing her with no reasonable alternative, resulting in her retirement.

Nurse Hicks had no intention of retiring at her age. Retirement meant the loss of wages, loss of 401k growth, and loss of insurance, of which she was the primary carrier during a truly unprecedented time in American history. In fact, Nurse Hicks planned to continue working with

1

the Hospital in her current role until she was 70 years old, or in six (6) years. Nurse Hicks was treated less favorably than similarly situated employees who were younger, and she has provided factual support for her age and disability discrimination claims below. In addition, Nurse Hicks will provide facts that provide a basis for her assertion that her original accommodation was revoked and that BUMC failed to offer a reasonable accommodation following revocation of the health exemption. Any argument by BUMC that a reasonable accommodation, outside of the health exemption, was provided is negated due to BUMC's lack of participation in the interactive process and failure to allow time for Nurse Hicks to make a voluntary decision concerning her future with BUMC.

## PARTIES

1. Plaintiff, Linda Hicks, is an employee of Defendant who was once approved for a medical exemption by Defendant yet had the exemption revoked without a valid reason.

2. Plaintiff, Linda Hicks, was not provided a reasonable accommodation despite Defendant's knowledge of her disability covered by the ADA.

3. Defendant, Baylor University Medical Center, part of Baylor Scott & White Health, is a hospital in Dallas, Texas, with a principal address listed as 3500 Gaston Avenue, Dallas, Texas 75246.

4. Defendant, Baylor University Medical Center, is one of the major centers for patient care, medical training, and research in North Texas.

5. At all relevant times, Defendant Baylor University Medical Center has continuously been doing business in the State of Texas and has continuously had at least fifteen (15) employees.

6. At all relevant times, Defendant, Baylor University Medical Center, has continuously been an

employer engaged in an industry affecting commerce under Section 101(5) of the ADA, as amended, 42 U.S.C.§ 12111(5), and Section 101(7) of the ADA, 42 U.S.C. § 12111(7).

7. At all relevant times, Defendant, Baylor University Medical Center, has been a covered entity under Section 101(2) of the ADA, as amended, 42 U.S.C. § 12111(2).

## JURISDICTION AND VENUE

8. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343, and 1345. This action is authorized and instituted pursuant to Section 107(a) of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §12117(a).

9. The employment practices alleged to be unlawful were committed within the jurisdiction for the United States District Court for the Northern District of Texas.

## FACTS

10. Nurse Hicks began work with Baylor University Medical Center ("the Hospital"), or its predecessor, in September of 1990. Her 30th anniversary with the Hospital was coming up, and she looked forward to sharing it with her coworkers. Throughout her almost 30 years, she worked in four main departments and served on multiple committees. She also was named Nurse of the Year and has received the President's Service Excellence Award in addition to winning and being nominated for multiple other awards, including the 5 Star Spirit award and Encore award. Additionally, she received multiple commendations by her fellow colleagues.

11. By all accounts, Nurse Hicks was a model employee, and she exemplified the Hospitals ethos of "Better never settles." She was looking forward to celebrating her 30 years with her colleagues and with the Hospital she had given her life to, but ultimately, that was not meant to be.

12. In March of 2020, lockdowns and quarantining began in Dallas County due to severe acute

respiratory syndrome coronavirus 2 ((SARS-CoV-2) which causes the coronavirus disease (COVID-19). [1] [2]

13. Certain individuals are at high risk of developing severe complications from COVID-19, including death. [3] People with diabetes are included on that list. *Id.* Additionally, older Americans are also at a higher risk for developing severe consequences from the disease.[4]

14. Nurse Hicks is diabetic, a disability recognized by the Americans with Disabilities Act as amended by the ADA Amendments Act. [5] Additionally, on June 25, 2020, she celebrated her 62nd birthday.

15. Due to her condition as a diabetic and age, Nurse Hicks submitted a COVID-19 Medical Exemption on May 4, 2020. Nurse Hicks completed the necessary paperwork and submitted the form through the appropriate channels. On May 13, 2020, her accommodation was **approved** by Collin Buford, Manager BSW Employee Health, on behalf of the COVID-19 Exemption Review

---

[1] Cassandra Swaby, Dallas County orders residents to shelter in place as coronavirus cases there spread The Texas Tribune (2020), https://www.texastribune.org/2020/03/22/dallas-county-coronavirus-prompts-officials-issue-shelter-place-order/#:~:text=Dallas%20County%20Judge%20Clay%20Jenkins%20issued%20a%20countywide%20shelter%2Din,will%20continue%20through%20April%203. (last visited Nov. 14, 2021).

[2] Naming the coronavirus disease (COVID-19) and the virus that causes it, Who.int (2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (last visited Nov. 14, 2021).

[3] : Ncbi.nlm.nih.gov (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7205616/pdf/main.pdf (last visited Nov. 14, 2020); *see also,* People with Diabetes May Have High Risk for COVID-19: What to Do, Healthline (2020), https://www.healthline.com/health-news/people-with-diabetes-risk-healthcare-covid19 (last visited Nov. 14, 2020); *see also,* (2020), https://www.cebm.net/covid-19/diabetes-and-risks-from-covid-19/ (last visited Oct 12, 2020).; *see also,* Coronavirus Disease 2019 (COVID-19), Centers for Disease Control and Prevention (2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Oct 9, 2020).

[4] *Id. See also,* Coronavirus Disease (COVID-19), Centers for Disease Control and Prevention (2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Nov. 14, 2021).

[5] Diabetes in the Workplace and the ADA | U.S. Equal Employment Opportunity Commission, Eeoc.gov (2021), https://www.eeoc.gov/laws/guidance/diabetes-workplace-and-ada (last visited Nov. 14, 2021).

Committee. The notification stated, "If your current role is responsible for providing care to PUI or COVID-19 patients or to screen patients for COVID-19, please reach out to your manager to discuss other options, including placement in the flex pool." The notification went on to state that "If you are not currently providing care for this population of patients, you may continue in your current role.".

16. Nurse Hicks's role at the time was in the preadmissions department, where her role was to preadmit patients by telephone for upcoming surgeries. In fact, Nurse Hicks had not been in a position involving direct patient care since 2009.

17. In 2018 Nurse Hicks took over the chart room nurse role, which was previously filled by another nurse. In 2018, Nurse Hicks was provided a copy of the previous chart room nurse's job description to edit. However, upper management failed to incorporate edits. Therefore, the 2014 version titled Vicky's Job Description is the only available copy to reference when discussing Nurse Hicks's current position. In this position, Nurse Hicks duties included: checking surgical charts for the next day surgery cases, verifying ordered testing was completed and notifying physician/surgical department if not complete, schedule testing for patients prior to surgery, providing information to nurses and administrative staff through a regular email, and several other small tasks.

18. On May 18, 2020, despite being given an accommodation for her disability and despite being told that if a position required screening patients for COVID-19 other options would be available to those with an accommodation, Nurse Hicks was called into the office of her manager and was told that the health accommodation she had been given only five (5) short days earlier did not apply to her department. She was told she would have to begin screening patients for COVID-19

before they were to be admitted for surgery. Nurse Hicks was then told she had until May 20, 2020, to ultimately decide if she would stay and screen patients or retire early.

19. A company that she had given almost 30 years to give her two (2) days to decide if she could work without the accommodation which had already been approved. No other options were provided to Nurse Hicks.

20. On May 19, 2020, Nurse Hicks called the Compliance Hotline regarding the decision that her accommodation no longer applied. She was given the report number 2005BSW10019. She voiced her concern regarding the revocation of the accommodation she received due to her disability because she believed the Hospital had a duty to embody its value of "Acting Honestly."[6] Further, Nurse Hicks believed that the Hospital would follow its own guidance that it would "consider the safety and security of patients, members and staff in all our activities and address any outcome of care, including any unanticipated outcomes, by taking appropriate action and following the problem to resolution." *Id.* After speaking with the Compliance Hotline, she was informed she would receive a decision from the "Committee" by June 2, 2020.

21. Because she was left with no other option, Nurse Hicks submitted a "Letter of Intent to Retire" on May 20, 2020. *See* Exhibit 3: Letter of Intent to Retire. Within the letter, Nurse Hicks made it clear that she did not want to retire as she stated, "There is a possibility of changing my plans if I hear back from the Compliance Committee that my COVID-19 Approved Health Exemption would apply to my current position." *Id.*

22. On June 3, 2020, Nurse Hicks called to get a decision on her case. She was informed that the

---

[6] Bswhealth.com (2020), https://www.bswhealth.com/SiteCollectionDocuments/code-of-conduct/bswh-code-of-conduct.pdf (last visited Nov. 14, 2020).

Committee did not rule in her favor and that her accommodation was taken away from her. She then requested a copy of the report of the Committee for her file. It should be noted that she followed up requesting a copy of the report on June 24, 2020, and on August 14, 2020, and still has not received a copy despite the fact that the committee sanctioned the discrimination of an individual with disabilities.

23. On June 5, 2020, only a few months short of her 30th anniversary, Nurse Hicks was forced to retire as her accommodation which had been approved, was revoked, and she could no longer continue in the role and was given no other option. Ironically, on July 20, 2020, Nurse Hicks received a letter signed by Alex Arroliga, MD, and Janice Walker, DHA, RN, BSN, informing her that she could return to the Hospital in a PRN or part-time basis to assist in areas of need. The letter states, "your service would not be at the bedside, but rather in another area of a hospital that would benefit most from your expertise and willingness to assist." Nurse Hicks was not given the opportunity to be moved to "another area of a hospital that would benefit most" from her expertise. Instead, the hospital replaced Nurse Hicks and other older nurses within the preadmissions department with younger nurses who BUMC would not have to accommodate

## ADMINISTRATIVE PROCEDURES

24. Before filing suit under the ADA or the ADEA, a plaintiff must exhaust administrative remedies by filing a charge with the EEOC. Jenkins v. City of San Antonio Fire Dep't, 2014 WL 1492756, at 5 (W.D. Tex. 2014); 42 U.S.C. § 12117(a) (incorporating into the ADA the process laid out for Title VII claims in 42 U.S.C. § 2000e-5(e)(1)); 29 U.S.C. § 626(d) (requiring a charge with the EEOC before a civil action can commence).

25. Plaintiff submitted a "Charge of Discrimination" form to the EEOC and against Defendant within 180 days of the occurrence of the acts of which she now complains.

26. On or about November 2nd, Plaintiff obtained a "Notice of Right to Sue" letter from the EEOC.

27. Plaintiff's counsel requested the Notice of Right to Sue letter from the EEOC due to the fact the EEOC was unable to complete its administrative processing within 180 days. (*See,* Exhibit 1).

28. All conditions precedent to the institution of this lawsuit have been fulfilled.

### SWABBING PATIENTS WAS NOT AN ESSENTIAL JOB DUTY FOR NURSE HICKS

29. Essential functions are "fundamental job duties of the employment position the individual with a disability holds or desires," as opposed to "marginal" job duties,[7] such that a job is "fundamentally alter[ed]" if an essential function is removed,[8] "Congress did not specify which job functions are 'essential' under the ADA."[9] Instead, "[f]act-finders must determine whether a function is 'essential' on a case-by-case basis."[10] The text of the ADA indicates where this inquiry should begin: " … consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description, […] this description shall be considered evidence of the essential functions of the job."[11]

30. BUMC did not provide any information to Nurse Hicks showing that the swabbing of patients was an essential function of her job.  Further, BUMC failed to update, review, and apply Nurse Hicks' Job Description when determining whether swabbing of patients was intended as an essential job function.

31. In 2018 Nurse Hicks took over the chart room nurse role, which was previously filled by another nurse.  In 2018, Nurse Hicks was provided a copy of the previous chart room nurse's job description to edit.  However, upper management failed to incorporate edits.  Therefore, it can be

---

[7] 29 C.F.R. § 1630.2(n)(1).
[8] *Id.*
[9] *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996).
[10] *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 698 (5th Cir. 2014).
[11] 42 U.S.C. § 12111(8).

assumed that the 2014 version titled Vicky's Job Description is the only available copy to reference when discussing Nurse Hicks's current position. In this position, Nurse Hicks duties included: checking surgical charts for the next day surgery cases, verifying ordered testing was completed and notifying physician/surgical department if not complete, schedule testing for patients prior to surgery, providing information to nurses and administrative staff through a regular email, and several other small tasks. As indicated by the above, none of her current job duties involved patient contact. In addition, as previously noted, Nurse Hicks had not been in a position requiring direct patient care since 2009.

32. Given the substantial amount of time Nurse Hicks has had no patient contact and no indication within the job description that she would ever be put in a position to come in contact with patients; it is clear that screening patients outside of a phone conversation was never intended to be an essential function of Nurse Hicks' job.

## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

33. Plaintiff incorporates all preceding paragraphs of this Complaint as if they were set forth within this cause of action.

34. The Americans with Disabilities Act (ADA), as amended, 42 U.S.C. §§ 12101 *et seq*.., is a federal law that prohibits discrimination against qualified individuals with disabilities. Individuals with disabilities include those who have impairments that substantially limit a major life activity, have a record (or history) of a substantially limiting impairment, or are regarded as having a disability."[12] "It is clear that diabetes, a disease affecting the digestive, hemic, and endocrine systems, is a physical impairment under the ADA." *Griffin v. United Parcel Services, Inc.,* 661

---

[12] Diabetes in the Workplace and the ADA | U.S. Equal Employment Opportunity Commission, Eeoc.gov (2020), https://www.eeoc.gov/laws/guidance/diabetes-workplace-and-ada (last visited Nov. 14, 2020).

F.3d 216, 222 (2011); *see also, Grant v. Harris County,* 794 Fed.Appx. 352 (2019). An employer is to provide reasonable accommodations for employees with a disability under the ADA.[13]

35. To prevail on a discrimination claim under the Americans with Disabilities Act ("ADA"), Nurse Hicks must establish that 1) she has a disability; 2) she is qualified for the position in which she seeks employment, and 3) she was discriminated against because of her disability.[14] Under the ADA, to "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."[15]

36. Since at least May 2020, Defendant has engaged in unlawful employment practices in violation of Title I of the ADA, as amended, 42 U.S.C. §§ 12101 *et seq*.

*Disability Discrimination*

37. The facts provided in this complaint establish that the health exemption revocation was an act of discrimination towards Nurse Hicks based on her known and recorded diabetic condition. It is undisputed that Nurse Hicks has a disability, and the facts highlight the exceptional thirty years of service and a small portion of the multitude of awards received by Nurse Hicks, which establish she is qualified for her position. BUMC's actions were an attempt to weed out older nurses and a way to target those with the health exemption, and therefore, is a clear act of discrimination.

38. The unlawful practices were to discriminate against Nurse Hicks based on her disability (diabetes) in violation of the Americans With Disabilities Act (ADA), resulting in her forced

---

[13] Eeoc.gov (2020), https://www.eeoc.gov/laws/guidance/diabetes-workplace-and-ada (last visited Nov. 14, 2020).
[14] *Jenkins v. Cleco Power, LLC,* 487 F.3d 309, 315 (5th Cir.2007).
[15] 42 U.S.C. § 12112(b)(5)(A).

retirement in violation of 42 U.S.C. § 12112(a), as amended.

39.  Below will provide an overview of BUMC's unlawful practices that resulted in discrimination: Section a will establish BUMC's failure to accommodate Nurse Hicks' disability, and section b will discuss BUMC's failure to participate in the interactive process.

*BUMC's Failure to Accommodate*

40. BUMC provided Nurse Hicks with only three choices and required a response by May 20, 2020: Personal leave through June 7th, which would result in having to retire early at that point; sign an intent to retire and finalize retirement if the committee denied use of the exemption, or remain in her position and swab patients despite a valid health exemption. These are hardly "accommodations," much less "reasonable accommodations." Further, Nurse Hicks' manager essentially told her there was no need to waste a mask or training on her due to the revocation of her health exemption made two days prior to this conversation on May 18, 2020.

41. It should be reiterated, along with the unreasonable choices, BUMC only gave Nurse Hicks two days to make a decision. In addition to providing a reasonable accommodation, it is common practice for employers to provide a reasonable time period for employees to consider options.[16] Nurse Hicks was not afforded such an opportunity and was in turn forced into retirement.[17] This type of treatment should be closely scrutinized to protect employees like Nurse Hicks.  It is known that early retirement is a major decision with a far-reaching impact on the lives of older workers

---

[16] *Paolillo* v. *Dresser Indus., Inc.*, 821 F.2d 81, 84 (2d Cir. 1987).
[17] The test of voluntariness in connection with accepting a retirement package is whether a reasonable person would have felt that there was no choice but to accept the offer, and the time that the offer was open is one factor in such a determination. *See, e.g., Auerbach v. Bd. of Educ.* 136 F.3d 104, 113 (2d Cir.1998); Leiman v. New York, No. 98 CIV. 5538 (MHD), 2000 WL 1364365, 11 (S.D.N.Y. Sept. 21, 2000), aff'd, 9 F. App'x 37 (2d Cir. 2001).

and one that must be voluntarily made.[18] While the determination for what is considered reasonable consideration is dependent on the circumstances of each case, it can reasonably be assumed two days is not reasonable. Therefore, BUMC's proposed "reasonable accommodations" were just a disguised take-it-or-leave-it proposal.[19]

42. It is clear from the above that Nurse Hicks was fighting for a reasonable accommodation. In fact, Nurse Hicks received a reasonable accommodation when the health exemption was put into place and was only requesting that accommodation be honored or another accommodation replace the previous one. However, outside of the previous accommodation, BUMC only offered accommodations that were unreasonable in light of the circumstances.

43. BUMC attempted to negate the issue above claimed the EEOC process by asserting it was "not required to accommodate Charging Party by removing one of the essential functions of her job," but BUMC has failed to show that swabbing patients was ever intended or established as an essential function of Nurse Hicks' job.

### *BUMC Failed to Engage in the Interactive Process*

44. Further, it has been held that "[W]here the disability, resulting limitations, and necessary reasonable accommodations are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee ... to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations."[20] In the current matter, Nurse Hicks' manager failed to acknowledge the accepted health exemption was the "open, obvious, and apparent" accommodation.

---

[18] *Id.*
[19] *Paolillo*, 821 F.2d at 81-4.
[20] *E.E.O.C.* v. *Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009).

45. However, even if the above argument fails, Nurse Hicks satisfied her burden by filing an exemption on the basis that she is immunocompromised. When informed that the exemption did not apply to swabbing patients prior to surgery, she attempted to have conversations with her manager. She also sought approval from the compliance committee for the exemption to apply to her current role.[21] In light of these requests, "the employer is obligated by law to engage in an interactive process: a meaningful dialogue with the employee to find the best means of accommodating that disability."[22]

46. Nurse Hicks' manager or other BUMC members never showed a willingness to engage in a good-faith, interactive process with Nurse Hicks regarding her request for the health exemption to apply or to provide other reasonable accommodations. Only after Nurse Hicks was required to sign a letter of intent to retire, and after she attempted to speak to HR directly and found the office locked due to employees working from home did HR email her. The HR employee offered Nurse Hicks to look at other job postings, but this was not a true accommodation due to COVID-19 and lack of suitable employment opportunities for an employee over the age of sixty with diabetes. Therefore, any accommodation BUMC argues they provided on the basis of this email exchange were unreasonable, and Nurse Hicks felt she had no choice but to retire early.[23]

47. As evidenced by the above, Nurse Hicks has clearly provided the factual support necessary to prevail on an ADA claim.

48. The effect of the practices complained of in paragraphs 10-55 above has been to deprive Nurse

---

[21] *Ballard* v. *Rubin*, 284 F.3d 957, 960–61 (8th Cir. 2002), A request for accommodation need not be in writing or use "the magic words 'reasonable accommodation,'" "but it "must make clear that the employee wants assistance for his or her disability."
[22] *Id.*
[23] *Loulseged v. Akzo Nobel Inc.,* 178 F.3d 731, 736 (5th Cir.1999), "[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA.".

13

Hicks of equal employment opportunities and otherwise adversely affect her status as an employee because of her disability.

49. The unlawful employment practices complained of in paragraphs 10-50 above were intentional.

50. The unlawful employment practices complained of in paragraphs 10-55 above were done with malice or with reckless indifference to the federally protected rights of Nurse Hicks.

## AGE DISCRIMINATION

51. Plaintiff incorporates all preceding paragraphs of this Complaint as if they were set forth within this cause of action.

52. The Age Discrimination in Employment Act ("ADEA") prohibits employment discrimination against applicants and employees on the basis of age (forty (40) and older).[24]

53. BUMC's initial age requirement of sixty to apply for the health exemption shows BUMC was and is aware that the categories of people at higher risk of severe illness from COVID-19 include "older adults."[25]  However, BUMC's reasons behind revoking the exemption are meritless. Therefore, it is only reasonable to conclude that the health exemption, which Nurse Hicks' manager encouraged her and others to get to avoid potential administration of COVID testing, was revoked to push the primary groups receiving the exemption, which includes older adults, to retire or quit.

54. In addition to herself, Nurse Hicks is aware of other nurses, the majority of whom are over the age of sixty, who felt forced to give notice of retirement or leave due to reasons, including age. Nurse Hicks supports the aforementioned assertions that BUMC has discriminated against her on

---

[24] 29 U.S.C. § 621-634.
[25] CMS0012-IFC, file:///C:/Users/whma50420s/Desktop/CMS-9912-IFC%20IFC 4%20Master%20OC%20document %2010-28-20-508.pdf, (Oct. 28, 2020).

the basis of age by pointing to BUMC's recent actions, which include: encouragement by Nurse Hicks' manager to fill out the exemption application if nurses were unable to screen potential COVID-19 patients, and then the same manager saying the exemption did not apply for that very reason; the replacement of older nurses, including Nurse Hicks, within the preadmissions department with younger nurses who BUMC would not have to accommodate; and the use of the health exemption to classify employees in a way that has affected Nurse Hicks' status[26] as an employee.

55. Nurse Hicks has provided a basis for the conclusion that she was treated less favorably than similarly situated employees who were younger, and she has provided factual support for her age and disability discrimination claims.  In addition, Nurse Hicks has shown that her original accommodation was revoked, and that BUMC failed to offer a reasonable accommodation following revocation of the health exemption.  Any argument that a reasonable accommodation, outside of the health exemption, was provided by BUMC is negated due to BUMC's lack of participation in the interactive process, and failure to allow time for Nurse Hicks to make a voluntary decision concerning her future with BUMC.

## JURY TRIAL DEMAND

56. Plaintiff requests a jury trial on all questions of fact raised by its complaint.

## PRAYER

Plaintiff respectfully requests this Court:

a. Order Defendant to institute and carry out policies, practices, and

---

[26] 29 U.S.C. § 623(a)(1)-(3) Employers cannot do any of the following because of an individual's age: […] Segregate or classify employees in a way that: deprives the employees of employment opportunities, or *adversely affects their status as employees*.

      programs that provide equal employment opportunities for persons with disabilities, and which eradicate the effects of its past and present unlawful employment practices.

b. Order to make whole Linda Hicks, RN. by providing appropriate back pay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to, reinstatement of Linda Hicks, RN, or front pay in lieu thereof.

c. Order Defendant, to make whole Linda Hicks, RN by providing compensation for past and future nonpecuniary losses resulting from the unlawful employment practices described in paragraphs 10-50 above, including but not limited to, emotional pain and suffering, stress, inconvenience, and loss of enjoyment of life, in amounts to be determined at trial.

d. Order Defendant to pay Linda Hicks, RN punitive damages for engaging in discriminatory practices with malice or reckless indifference to Linda Hicks', RN federally protected rights, as described in paragraphs 10-50 above, in amounts to be determined at trial.

e. Reasonable attorney fees.

f. Court costs.

g. All other relief the Court deems appropriate.

Respectfully submitted,

**KENNEDY**
Attorneys & Counselors at Law

/s/ Mark S. Kennedy
MARK S. KENNEDY
State Bar of Texas No. 24000122
LURESE A. TERRELL
State Bar of Texas No. 24008139
C. TREY SCOTT
State Bar of Texas No. 24083821
12222 Merit Drive, Suite 1750
Dallas, TX 75251
Telephone: (214) 445-0740
Fax: (972) 661-9320
markskennedylaw@msn.com