## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| LINDA R HICKS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-CV-00072-E |
| | § | |
| BAYLOR UNIVERSITY MEDICAL | § | |
| CENTER DALLAS, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are three pending motions filed by Defendant Baylor University Medical Center Dallas ("Baylor"): (1) Motion to Strike Expert Testimony, (ECF No. 41); (2) Motion for Summary Judgment, (ECF No. 49); and (3) Motion to Strike Portions of Plaintiff's Summary Judgment Appendix, (ECF No. 59). Based on the relevant briefing, appendices, and applicable law, the Court hereby (1) **DENIES AS MOOT** Baylor's Motion to Strike Expert Testimony; **GRANTS** Baylor's Motion for Summary Judgment; and (3) **DENIES AS MOOT** Baylor's Motion to Strike Portions of Plaintiff's Summary Judgment Appendix.

### I.   BACKGROUND

#### A.   Hicks' Employment with Baylor

This case arises out of an employment dispute concerning alleged discrimination between an employee and her employer. Linda R. Hicks ("Hicks") began working at Baylor in September of 1990 as a Registered Nurse ("RN"). (ECF No. 1 at 3). Hicks was diagnosed with diabetes in 2015 and has since been on multiple medications to help control it. (ECF No. 56 at 20–22). On June 25, 2020, Hicks celebrated her sixty-second birthday. (ECF No. 1 at 4).

While working for Baylor, Hicks worked in four different departments. (ECF No. 56 at 24). In 2009, Hicks moved to the preadmission testing department ("PAT Department"), where her role consisted of preparing the charts and patients for surgery. (ECF No. 56 at 24). The PAT Department was managed by Sandy Waggoner ("Waggoner") and included a lab and chart room. (ECF No. 50 at 10). In 2013, Hicks signed an RN job description which "clearly advised that the job duties are general in nature, other duties can be assigned, and the RN is expected to be flexible and adaptable." (ECF No. 50 at 11). In 2018 Hicks' role changed from RN to Chart Room Nurse, which was her job title until June 5, 2020, when she retired. (ECF No. 56 at 24–25). Hicks took over this role of Chart Room Nurse from a retired employee, and this nurse's job description—Vicky's Job Description—was the only official document Hicks had to reference the duties of this position. (ECF No. 1 at 5). However, as the duties involved in this role had grown, "Plaintiff developed her own guide at the urging of her manager detailing the responsibilities of the job for use as a future job description." (ECF No. 56 at 26).

Like the rest of the world, lockdowns and quarantining began in Dallas County due to the coronavirus disease ("COVID-19") in March 2020. (ECF No. 1 at 3–4). Baylor issued its first COVID-19 medical exemption policy on March 1, 2020, stating that "pregnant, immunocompromised, and employees over the age of 60 were exempt from caring for a lab-confirmed Covid-19 patient." (ECF No. 50 at 12–13). In April, Baylor published its "Overview, process and FAQs COVID-19 Exemption request process." (ECF No. 50 at 13). This guide explained the scope of the exemption as:

> Those who meet the eligibility for a COVID-19 exemption will not have responsibility for providing care to Patients Under Investigation (PUI) or COVID-19 patients. Furthermore an employee who is granted a COVID-19 patient exemption would not be assigned to a role of providing care to patients who had not been screened.

(ECF No. 51 at 105). On April 6, 2020, Baylor updated the COVID-19 medical exemption policy to change the age for exemption from over the age of 60 to over the age of 65, and also included breastfeeding as an additional ground for exemption. (ECF No. 50 at 14). Baylor then updated the exemption policy once more on April 20, 2020, to clarify that those claiming to be "immunocompromised" would require medical documentation, and additionally changed the age exemption to over 66 years of age. (ECF No. 50 at 14).

Because of her condition as a diagnosed diabetic, Hicks submitted a COVID-19 medical exemption on May 4, 2020. (ECF No. 1 at 4). Her concerns arose from her belief that "even if [patients] were screened prior to coming in, they weren't completely cleared of COVID until the results came in," and also "her age was concerning." (ECF No. 56 at 28). On May 13, 2020, Hicks' accommodation was approved by the COVID-19 Exemption Review Committee. (ECF No. 1 at 4). Her approval notice stated the following:

> This is to notify you that your request for COVID-19 exemption has been approved. If your current role is responsible for providing care to PUI or COVID-19 positive patients or to ***screen patients for COVID-19***, please reach out to your manager to discuss other options including placement in the flex pool. If you are not currently providing care for this population of patients, you may continue in your current role.

(ECF No. 56 at 29). After receiving this accommodation, Hicks remained working in the chart room and did not reach out to Waggoner, as she was included on the email, and Hicks was not conducting any screening. (ECF No. 56 at 29).

On May 18, 2020, Hicks was called into Waggoner's office who informed her that the PAT Department would conduct the pre-surgical nasal swabbing of prescreened patients for elective surgeries. (ECF No. 50 at 16). The three nurses who had previously been conducting such nasal swabbing were overwhelmed, and to ensure fairness, "the remaining PAT Department nurses would need to rotate through the tasks of making phone calls, getting charts ready in the chart

room, and performing the nasal swabbing." (ECF No. 50 at 16). As a nurse in the PAT Department, this preop COVID-19 testing applied to Hicks regardless of her exemption. (ECF No. 56 at 29–30). Waggoner told her staff—including Hicks—that they had the following options: (1) stay and perform the nasal swabbing; (2) take a protected leave of absence; (3) look for another position within the Baylor system and be provided help in the application process; or (4) retire. (ECF No. 50 at 17; ECF No. 56 at 30). As alleged, Hicks was then told that she had only two days—until May 20, 2020—to make the decision, a fact disputed by Baylor who contended Hicks had two weeks to make her decision. (ECF No. 1 at 6; ECF No. 50 at 17). Since her initial reasonable accommodation of the COVID-19 exemption no longer applied, Hicks then requested the accommodation of staying in the chart room and not having to participate in the nasal swabbing. (ECF No. 56 at 30).

On May 19, 2020, Hicks called the Compliance Hotline regarding the issue of her requested accommodations. (ECF No. 56 at 32). The matter was referred to an HR Business Partner. (ECF No. 56 at 32). After hearing her concerns, the Compliance Hotline told Hicks she would receive a decision from them by June 2, 2020. (ECF No. 1 at 6).

On May 20, 2020, Hicks received an email from the HR Business Partner that stated: "[i]f you decide to apply for positions, elsewhere, please apply on our Baylor career website, and email me the req# and job title. I will f/u with the TA team and hiring manager on your behalf." (ECF No. 56 at 33). On that same day, Hicks submitted a letter of intent to retire, noting that her plans might change if her exemption was honored. (ECF No. 1 at 6).

On June 3, 2020, Hicks was informed by the Compliance Hotline that her accommodation was taken away from her. (ECF No. 1 at 7). On June 5, 2020, Hicks retired stating she had no

choice "as her accommodation which had been approved, was revoked, and she could no longer continue in the role and was given no other option." (ECF No. 1 at 7).

On July 20, 2020, Hicks received a letter from Baylor who informed her she could return to the hospital in a PRN or part-time basis, and that "[her] service would not be at the bedside, but rather in another area of a hospital that would benefit most from [her] expertise and willingness to assist." (ECF No. 1 at 7). However, Hicks alleged that she was not given the opportunity to be moved to another area of a hospital that would most benefit her expertise, and instead, alleged that Baylor replaced Hicks and other older nurses within the PAT Department with younger nurses. (ECF No. 1 at 7). After receiving the letter, Hicks did not take Baylor up on its offer of employment, nor did she look for employment elsewhere.

## B.    Procedural Framework

On December 10, 2020, Hicks filed her Charge with the EEOC alleging disability and age discrimination. (ECF No. 50 at 19). She then received her Right to Sue letter from the EEOC on October 29, 2021, and subsequently filed this lawsuit. (ECF No. 56 at 35).

Hicks initiated this lawsuit on January 12, 2022, alleging the following causes of action against Baylor under Title I of the Americans with Disabilities Act of 1990 ("the ADA") and the Age Discrimination in Employment Act of 1967 ("the ADEA"): (i) disability discrimination, (ii) failure to accommodate, and (iii) age discrimination. (ECF No. 1).

On November 30, 2023, Baylor filed its Motion to Strike Expert Testimony of Dr. Suneil Koliwad, (ECF No. 41), along with its appendix in support, (ECF No. 42). Hicks responded on January 5, 2024, (ECF No. 47), and Baylor subsequently replied, (ECF No. 48), on January 17, 2024.

Additionally, on January 30, 2024, Baylor filed its Motion for Summary Judgment, seeking dismissal of all of Hicks' claims. (ECF No. 49). Baylor also filed its brief in support, (ECF No. 50), and appendix in support, (ECF No. 51), contemporaneously with its motion. Hicks responded on March 5, 2024, (ECF No. 55), along with her brief in support, (ECF No. 56), and appendix in support, (ECF No. 57). On March 27, 2024, Baylor replied. (ECF No. 60).

Also on March 27, 2024, Baylor filed its Motion to Strike Portions of Plaintiff's Summary Judgment Appendix. (ECF No. 59). Hicks filed an amended response, (ECF No. 66), on April 23, 2024, along with her appendix in support, (ECF No. 62). Baylor subsequently replied on May 7, 2024. (ECF No. 68).

Thus, all three motions have been fully briefed and are ripe for adjudication.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate when the pleadings and evidence on file show "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. A court must view all evidence and draw all reasonable inferences in the light most favorable to a party opposing a summary judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). A court "may not make credibility determinations or weigh the evidence" in ruling on the motion. *Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 254–55. Moreover, the evidence the non-movant provides must raise "more than . . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The evidence must be such that a jury could

reasonably find in the non-movant's favor. *Anderson*, 477 U.S. at 248. If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

The moving party bears the initial burden of showing the court there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party with the burden of proof on an issue "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted). When, as here, a nonmovant bears the burden of proof, the movant may demonstrate it is entitled to summary judgment either by (1) *submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense*, or (2) *arguing there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. Celotex*, 477 U.S. at 322–25 (emphasis added). There is "no genuine issue as to any material fact [if] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see generally Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F.Supp. 943, 962 (N.D. Tex. 1995) (quoting *Fontenot*, 780 F.2d at 1194) (discussing affirmative defenses).

Once the movant has made this showing, the burden shifts to the nonmovant to establish there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Celotex*, 477 U.S. at 324. "[C]onclusory allegations, speculation, and unsubstantiated assertions" will not satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1). A court "resolve[s] factual controversies in favor of a nonmoving party . . . only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts."

*Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). When a plaintiff fails to defend a claim in response to a summary judgment motion, the claim is deemed abandoned. *See Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (concluding that the plaintiff abandoned her retaliatory abandonment claim when she failed to defend the claim in response to a motion to dismiss).

"A party opposing such a summary judgment motion may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). The Fifth Circuit has explained:

> The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim.... "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992).

*Ragas*, 136 F.3d at 458. Regarding assertions of fact, Federal Rule of Civil Procedure 56 states:

> [i]f a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may ... (2) consider the fact undisputed for purposes of the motion [and] (3) grant summary judgment if the motion and supporting materials— including the facts considered undisputed—show that the movant is entitled to it[.]

Fed. R. Civ. P. 56(e)(2)-(3).

## B.    Expert Testimony

Expert testimony is governed by Federal Rule of Evidence 702. This rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court addressed the standard for admitting expert scientific testimony under Rule 702 and assigned a gatekeeping function in that regard to trial courts. 509 U.S. 579, 589 (1993). In *Kumho Tire Co., Ltd. v. Carmichael*, the Supreme Court extended the gatekeeping function to encompass all expert testimony, including expert opinion testimony that is not "scientific" in nature, but is based on technical and "other specialized" knowledge. 526 U.S. 137, 142–43, 147 (1999). Summarizing this precedent, the Fifth Circuit advised that the crux of the Rule 702 inquiry is "whether the expert testimony is both reliable and relevant." *Burleson v. Texas Dept. of Crim. Justice*, 393 F.3d 577, 583 (5th Cir. 2004).

Importantly, the inclusion or exclusion of evidence does not necessitate a finding that the disputed evidence is either perfectly reliable or wholly unreliable. On one hand, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. And on the other, "a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations." *Daubert*, 509 U.S. at 597. Recognizing the inherent complexity and nuance of determinations on the admissibly of expert evidence, the Supreme Court affords "broad latitude" to the trial courts that make these initial evidentiary rulings, and only reviews those decisions on an abuse of discretion standard. *Kumho Tire*, 526 U.S. at 153.

An expert may testify on scientific or other specialized matters if it will help the trier of fact understand the evidence or determine a fact in issue so long as the expert's testimony is based

upon sufficient facts or data, the testimony is the product of reliable principles or methods, and the witness has applied the principles and methods reliably to the facts of the case. *See* FED. R. EVID. 702. In short, expert testimony is admissible only if it is relevant and reliable. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Daubert*, 509 U.S. at 589).

Expert evidence is relevant in a case if it helps the trier of fact understand the evidence in the case or determine a fact at issue. *See* FED. R. EVID. 702; *Daubert*, 509 U.S. at 591. Expert testimony is relevant if the reasoning or methodology used by the expert can properly be applied to the facts in the case. *See Daubert*, 509 U.S. at 592–93. If an expert's opinion is not relevant, the Court should exclude the opinion. *See* FED. R. EVID. 402; *Daubert*, 509 U.S. at 591.

The proponent of expert testimony must prove by a preponderance of the evidence that the testimony is reliable. *See Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). To determine reliability, the Court considers several non-exclusive factors: (1) the extent to which the theory used by the expert has been or can be tested; (2) whether the theory has been subject to peer review and publication; (3) the technique's potential rate of error; (4) and whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community. *See Daubert*, 509 U.S. at 592–94. The Court may also consider whether the proposed expert's testimony makes an impermissible leap from the data used to form the opinion and the opinion given. *See General Elec. v. Joiner*, 522 U.S. 136, 146 (1997). Neither the Federal Rules of Evidence nor *Daubert* require the Court to admit opinion evidence which is connected to existing data only by the mere "say so," of the expert. *See Joiner*, 522 U.S. at 146. The Court should exclude testimony that is unreliable. *See Kumho Tire Co.*, 526 U.S. at 149.

### III.   Baylor's Motion for Summary Judgment

As Hicks alleges multiple types of discrimination against Baylor, the Court provides the following framework analysis, which is common to employment discrimination claims. "A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see, e.g.*, *Gaalla v. Brown*, 460 F. App'x 469, 479 (5th Cir. 2012). Regarding direct evidence, the Fifth Circuit has explained:

> Direct evidence [of discriminatory intent] is evidence which, if believed, proves the fact without inference or presumption.... It includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action.

*Gaalla*, 460 F. App'x at 479 (internal quotations omitted). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell*, 235 F.3d at 222. Circumstantial evidence includes statements that merely suggest discriminatory motive or require the fact finder to draw an inference as to whether the comment is probative of an employer's discriminatory animus. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897–98 (5th Cir. 2002), *cert. denied*, 539 U.S. 926, 123 S. Ct. 2572, 156 L.Ed.2d 602 (2003). The Fifth Circuit has explained the three-step *McDonnell Douglas* framework as follows:

> Under that framework, [a plaintiff] must make out a prima facie case of discrimination. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021). If she succeeds, [a defending employer] must respond with a "legitimate, nondiscriminatory reason" for terminating [the plaintiff]. *Id.* at 282. Then the burden shifts back to [the plaintiff], who must counter with substantial evidence 'that [the defending employer's] proffered reason is pretextual. *Id.*

*Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022). The second step of the *McDonnell Douglas* framework requires an employer's production of a legitimate, nondiscriminatory reason for terminating a plaintiff, but this second step "can involve no credibility assessment." *Reeves*, 530 U.S. at 142 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Regarding the third step of the *McDonnell Douglas* framework, "the plaintiff can rely on evidence that the employer's reasons were a pretext for unlawful discrimination." *Russell*, 235 F.3d at 222 (citing *McDonnell Douglas*, 411 U.S. at 804).

As stated above, Hicks alleges age discrimination against Baylor under the ADEA, as well as disability discrimination and failure to accommodate against Baylor under the ADA. The Court will first address Hicks' age discrimination claim, and then both her disability discrimination claims together, as the analysis overlaps.

## A.     Hicks' ADEA Claim

Baylor moves for summary judgment on Hicks' age discrimination claim under the ADEA on two grounds: (1) first, Hicks did not exhaust her administrative remedies with respect to an age discrimination claim; and (2) second, Hicks cannot make out a prima facie case of age discrimination. The Court concludes Hicks sufficiently exhausted her administrative remedies under the EEOC, but concurs with Baylor that Hicks failed to make out her prima facie case of age discrimination.

### 1.     Exhaustion of Administrative Remedies

"Employment discrimination plaintiffs must exhaust administrative remedies before pursuing claims in federal court." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002). "Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue." *Taylor*, 296 F.3d at 379. "Competing policies underlie judicial

interpretation of the exhaustion requirement." *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008). On one hand, the scope of an EEOC charge should be liberally construed for litigation purposes because Title VII "was designed to protect the many who are unlettered and unschooled in the nuances of literary draftsmanship." *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 465 (5th Cir. 1970). "On the other hand, a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in attempt to achieve non-judicial resolution of employment discrimination claims." *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006). In considering whether a charge sufficiently exhausts a plaintiff's administrative remedies, the Fifth Circuit has held:

> [T]he crucial element of a charge of discrimination is the factual statement contained therein. Everything else entered on the form is, in essence, a mere amplification of the factual allegations. The selection of the type of discrimination alleged, i.e., the selection of which box to check, is in reality nothing more than the attachment of a legal conclusion to the facts alleged.

*Sanchez*, 431 F.2d at 462.

Here, Hicks checked the box for both age and disability discrimination in her Charge to the EEOC. (*See* ECF No. 51 at 135–36). However, her factual statement therein is somewhat devoid of facts: "I believe that I was discriminated against based on my disability, in violation of the Americans with Disabilities Act of 1990, as amended as well as because of my age, 61, in violation of the Age Discrimination in Employment Act of 1967." (ECF No. 51 at 136). Reading the Charge broadly—as the Court must—the Court finds that the factual statement in Hicks' charge, although sparse, was sufficient to put Baylor on notice of Hicks' age discrimination claim. Stated simply, the investigation reasonably expected to grow out of Hicks' EEOC Charge did in fact encompass a claim for age discrimination.

Thus, Hicks sufficiently exhausted her administrative remedies for her age discrimination claim. The Court now analyzes the merits of Hicks' age discrimination claim.

>       2.       *Prima Facie Case of Age Discrimination*

"The ADEA . . . prohibit[s] an employer from discharging an employee on account of that employee's age." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015). Hicks offers no direct evidence on her ADEA age discrimination claim, so the burden-shifting framework articulated in *McDonnell Douglas* applies. *Goudeau*, 793 F.3d at 474 (applying *McDonnell Douglas* framework to ADEA age discrimination claim). In *Goudeau*, the Fifth Circuit explained:

> Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of age discrimination by showing that (1) [s]he was discharged; (2) [s]he was qualified for the position; (3) [s]he was within the protected class at the time of discharge; and (4) [s]he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of [her] age.

793 F.3d at 474. If the plaintiff establishes the requisite elements of her prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment decision. *See Owens*, 33 F.4th at 825. If the employer is able to do so, the burden shifts back to the plaintiff to show such reason was pretextual. *See Owens*, 33 F.4th at 825.

Here, Hicks fails to establish her prima facie case of age discrimination against Baylor, so the analysis ends with the first step of the *McDonnell Douglas* framework. Baylor contends that Hicks cannot establish a prima facie case for four reasons: (i) she can't establish she suffered an adverse employment action because she voluntarily resigned; (ii) she can't show she was replaced by someone outside the protected class; (iii) she can't establish she was replaced by someone younger; and (iv) she can't establish she was otherwise discharged because of her age. (ECF No. 50 at 23).

In response, Hicks argues that she has succeeded in establishing a case for age discrimination. In support of her bald assertion, she merely puts forth the following:

> Here, Plaintiff has shown evidence that she was discharged due to the short time she was given to make a decision and her attempts to go through the interactive process which will be discussed below. Further, as discussed below, Plaintiff was qualified for the position. Plaintiff was within the protected class due to her age and was discharged because of her age. During the EEOC investigation, the EEOC requested documentation from Defendant regarding the age of employees in the PAT department that had left at a similar time to Plaintiff. Of the nine (9) employees over the age of 50 in the department, six (6) received a COVID-19 exemption. Of those six (6), only one was still employed beyond the year 2020. In fact, in Plaintiff's department, five (5) of the nine (9) employees retired on or before June 9, 2020. This is clear that due to the ages of the individuals, Defendant was attempting to force them from employment.

(ECF No. 56 at 39) (internal citations omitted).

It is undisputed that Hicks falls within the protected class—over forty years of age—as she was sixty-one years old during the underlying events of this lawsuit. (*See* ECF No. 1 at 4). However, Hicks fails the first element of her prima facie case—she was not discharged. In her complaint, Hicks expressly states that "she was forced to retire." (ECF No. 1 at 7). Hicks fails to plead constructive discharge—the means by which a former employee who has resigned can satisfy the termination requirement. (*See* ECF No. 1). Further, when Baylor asserts in their motion for summary judgment that Hicks did not specifically plead constructive discharge, thus alerting Hicks to that fact, she chose not to plead or even address constructive discharge as a means of proving termination. (*See* ECF No. 56). She instead focuses on the statistics of employees over the age of fifty who chose to retire and offers a conclusory assertion that "due to the ages of the individuals, Defendant was attempting to force them from employment." (ECF No. 56 at 39).

By failing to prove she was subject to a "discharge," Hicks cannot make out her prima facie case, and her claim of age discrimination must fail at the first stage of the *McDonnell Douglas*

framework. The Court pretermits further analysis of Hicks' age discrimination claim, and grants summary judgment as to Baylor on this claim.

## B.   Hicks' ADA Claims

The ADA prohibits discrimination against a qualified individual based on the individual's disability. 42 U.S.C. § 12112(a); *see EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). Under the ADA, claims of disability discrimination and failure to accommodate are seemingly similar. As both require the plaintiff to prove she is a qualified individual with a disability,[1] the Court will analyze portions of these claims together.

As to the disability discrimination claim, Hicks does not offer any direct evidence of discrimination so the burden-shifting framework under *McDonnell Douglas* applies. *Goudeau*, 793 F.3d at 474. The first step of the framework requires an employee to establish her prima facie case. To prevail on a prima facie case of disability discrimination, an employee must establish: "(1) she is disabled within the meaning of the ADA, (2) she was qualified for the job, and (3) she was fired on account of her disability." *Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523, 526 (5th Cir. 2022). If all three elements are satisfied, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for termination. *See Owens*, 33 F.4th at 825. If the employer successfully does so, the burden shifts back to the employee to prove the reason was pretextual. *See Owens*, 33 F.4th at 825.

Baylor asserts Hicks cannot establish her prima facie case of disability discrimination as she cannot prove any of the three factors: (i) Hicks cannot establish she is disabled; (ii) Hicks was

---

[1] To succeed on both her intentional discrimination and failure-to-accommodate claims, Hicks must show that she has a disability under the ADA. *See, e.g. LHC Grp., Inc.*, 773 F.3d at 697 (explaining that to establish a *prima facie* case of discrimination under the ADA, a plaintiff must first demonstrate that he has a disability); *Feist v. La. Dep't of Just.*, 730 F.3d 450, 452 (5th Cir. 2013) (explaining that to prevail on a failure-to-accommodate claim, a plaintiff must first establish that he is a "qualified individual with a disability").

not qualified for her position because she refused to perform the essential function of nasal swabbing and further refused to engage in the interactive process; and (iii) Hicks wasn't subject to an adverse employment action because she refused to engage in the interactive process and instead voluntarily retired. (ECF No. 50 at 25–35).

Additionally, to prevail on a failure to accommodate claim, an employee must show that "(1) [she] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Jennings v. Towers Watson*, 11 F.4th 335, 343 (5th Cir. 2021).

Baylor argues that Hicks cannot succeed on a failure to accommodate claim as she was not a qualified individual with a disability, and she refused to engage in the interactive process. (ECF No. 50 at 37).

For clarity purposes, the Court will first address whether Hicks was disabled as defined by the ADA—an element Hicks must prove to succeed on both her disability discrimination and failure to accommodate claims.

### 1.    *Disability*

The ADA prohibits covered employees from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). "As a threshold requirement in an ADA claim, the plaintiff must, of course, establish that he has a disability." *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 654 (5th Cir. 2003). Under the ADA, a "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). "[M]ajor life activities include, but are not limited to, caring

for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Major bodily functions include, "but [are] not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). Further, a plaintiff is regarded as disabled if he:

> (1) has an impairment which is not substantially limiting but which the employer perceives as ... substantially limiting ...; (2) has an impairment which is substantially limiting only because of the attitudes of others towards such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment.

*Rodriguez v. ConAgra Grocery Prod. Co.*, 436 F.3d 468, 475 (5th Cir. 2006). "Substantially limits" means a person is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii).

Baylor argues that Hicks is not disabled as defined under the ADA as she fails to identify any major life activity that is substantially limited by her diabetes. (ECF No. 50 at 26). Hicks counters by stating:

> Plaintiff has diabetes and suffers from an endocrine inefficiency. Plaintiff is currently on multiple medications to control her diabetes. Additionally, she is working to control her weight through exercise and monitoring her eating habits. If Plaintiff does not monitor her eating, she gets "shaky." Further, in May of 2020, Plaintiff stated she has noticed her sugar levels fluctuating despite the medication she was on. Additionally, her physician, Dr. Randy Leach stated that due to Plaintiff's diabetes, she was immunocompromised.

(ECF No. 56 at 41–42). Thus, because the term "substantially limits" must be construed broadly, Hicks alleges that she is disabled as defined by the ADA.

In the Fifth Circuit, diabetes is not considered a "per se" disability; instead, "the analysis of when and under what conditions diabetes is considered a disability for ADA purposes is a matter of degree." *Griffin v. UPS*, 661 F.3d 216, 223 (5th Cir. 2011). The Americans with Disabilities Amendments Act of 2008 (the "ADAA") was passed in 2008 with the intention "that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations and . . . that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 244 (5th Cir. 2013) (citing Pub. L. No. 110-325, § 2(b)(5)). Among other things, the ADAA provides that the term "substantially limits" is to be interpreted as broadly as possible. § 12102(4)(A)-(B). Of particular importance to the present case, is the fact that the "endocrine function" was included in the definition of major bodily functions. *See* § 12102(2)(B).

Baylor does not argue that diabetes is not a disability under the ADA, but rather that Hicks' diabetes is not a disability under the ADA as it does not substantially limit her major life activities. (*See* ECF No. 51 at 5) (deposition of Linda Hicks).[2] However, Hicks was diagnosed with diabetes in 2015; she was prescribed medication; she has issues controlling her weight and eating habits—as she gets "shaky" if she does not monitor her eating; and she has experienced fluctuating sugar levels. (ECF No. 56 at 22). Further, Hicks' physician, Dr. Randy Leach, stated that due to her diabetes, Hicks qualified as "immunocompromised." (ECF No. 56 at 22). Such evidence is

---

[2] Q. Are there any activities you believe are substantially limited by your diabetic condition?
A. Only something that would maybe go – where I would go too long without eating and get shaky or – no, nothing other than that.
…
Q. [I]is there anything that you think you cannot do right now because of your diabetic condition, just anything in general? Breathing? Walking? Traveling? Thinking?
A. Not that I can think of right now.

sufficient for a reasonable jury to find that Hicks is disabled under the ADA. *See Milteer v. Navarro Cnty.*, 652 F. Supp. 3d 754, 763 (N.D. Tex. 2023) (holding that plaintiff's diabetes substantially limited his ability to work in an environment in which he could contract COVID-19 and thus constituted a "disability" under the ADA); *see also Gonzales v. Charlotte Pipe & Foundry Co.*, No. 619CV00181ADAJCM, 2020 WL 13609936, at *8 (W.D. Tex. June 23, 2020), report and recommendation adopted, No. 6-19-CV-00181-ADA, 2020 WL 13610359 (W.D. Tex. July 23, 2020) (holding plaintiff who was diagnosed with diabetes in 2011, was prescribed medication, experienced changes in his weight, and had a doctor's report stating plaintiff's diabetes caused his urgent need to urinate, was sufficient to establish the disability element of an ADA discrimination claim). Accordingly, the Court concludes that Hicks' diabetes constitutes a "disability" under the ADA.

Thus, Hicks satisfied the first element of her prima facie case of her disability discrimination claim, so the Court must now analyze whether Hicks was "qualified" to proceed with both her disability discrimination and failure to accommodate claims.

### 2.    *Qualified Individual*

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The question is whether [s]he was qualified at the time of [her] termination." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 582 (5th Cir. 2020). Thus, to avoid summary judgment, Hicks must show that either (1) she could perform the essential functions of the job in spite of her disability, or, if she could not, (2) that a reasonable accommodation would have enabled her to perform the essential functions of the job. *LHC Grp., Inc.*, 773 F.3d at 697.

(i)    <u>Essential Function</u>

"Fact-finders must determine whether a function is essential on a case-by-case basis." *Credeur v. Louisiana Through Off. of Att'y Gen.*, 860 F.3d 785, 792 (5th Cir. 2017). "A function is 'essential' if it bears 'more than a marginal relationship' to the employee's job." *LHC Grp., Inc.*, 773 F.3d at 697. In determining whether a function is essential, courts owe deference to an employer's position description: "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Evidence of whether a particular function is essential includes, but is not limited to, consideration of the following non-exhaustive factors:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the terms of a collective bargaining agreement; (6) the work experience of past incumbents on the job; and (7) the current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). The EEOC has offered further guidance on when a job function may be considered essential:

> (i) The function may be essential because the reason the position exists is to perform that function;
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2).

Thus, the Court must determine whether nasal swabbing was an essential function of Hicks' role. Baylor argues that the EEOC factors support their contention that nasal swabbing was an essential function of Hicks' job. (ECF No. 50 at 28–29). First, Baylor argues, Hicks concedes

that the only job description she signed for was for the RN position, and that she further admits she performed both PAT Department and chart room duties. (ECF No. 50 at 28–29). Further, nasal swabbing became an essential function due to the unanticipated arrival of COVID-19, in which all healthcare organizations "learned and adapted as fast as [they] could to raid changes in information about the pandemic." (ECF No. 50 at 28). If the nurses did not perform the nasal swabbing, the consequences "could be devastating in that other staff such as surgeons and nurses could be exposed to COVID-19," and the number of patients needed to be swabbed was only increasing. (ECF No. 50 at 31). In opposition, Hicks argues that "the swabbing of COVID-19 patients prior to outpatient surgery was not an essential job duty" for her, as "multiple other people could have performed this test other than Plaintiff's department." (ECF No. 56 at 43–44). Hicks further states that:

> [S]ufficient other individuals in a health system that includes 51 hospitals, more than 800 patient care sites, more than 7,300 active physicians, and over 49,000 employees that included revenue of over $1.3 billion with net income of over $277 million could have swabbed the patients instead of Plaintiff.

(ECF No. 56 at 43). Stated simply, Hicks rests her argument on the fact that because there are other people who could perform this task—nasal swabbing—it was not an essential function of her job. She provides no evidentiary support to this bare conclusion.

As "[t]he text of the ADA and its regulations require us to give greatest weight to the employer's judgment factor," the Court must prioritize Baylor's judgment. *Weber v. BNSF Ry. Co.*, 989 F.3d 320, 325 (5th Cir. 2021); *see McDaniel v. IntegraCare Holdings, Inc.*, 901 F. Supp. 2d 863, 872 (N.D. Tex. 2012) ("The ADA affords an employer significant latitude in determining the 'essential functions' of the position."). As stated above, nasal swabbing was not and could not have been in Hicks' job description because such function arose out of the onslaught of COVID-19—which did not exist at the time Hicks began working at Baylor. (*See* ECF No. 51 at 69–70).

However, her RN job description includes that the employee: "[e]mbraces true collaboration as an ongoing process . . ." (ECF No. 51 at 70). And it is true that functions and roles evolve as circumstances change—namely nationwide pandemics that wreak havoc on every industry, especially the healthcare industry. The crux of Baylor's argument is this: COVID-19 brought on many health-related issues leading to changes in protocol, and as three of the nurses in the PAT department—Hicks' department—were solely handling all of the nasal swabbing, Baylor made such function a shared responsibility of all nurses in the PAT Department. Accordingly, the only factor that does not explicitly support nasal swabbing as an essential function is the fact that it was not in the written description of Hicks' job description, nor was it discussed when she interviewed. As stated above, this would have been impossible as COVID-19 did not exist when Hicks signed her RN job description, nor when she transferred to the PAT Department or chart room.

Thus, the Court concludes nasal swabbing was an essential function of Hicks' role. Now, to avoid summary judgment, Hicks must show that a reasonable accommodation would have enabled her to perform the essential function—nasal swabbing—of her role.

### (ii)    Reasonable Accommodation and Interactive Process

The ADA requires employers to make "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). The ADA defines "reasonable accommodations" to include:

> [J]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B). However, "[t]he ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so." *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999)); *see also Barber v. Nabors Drilling U.S.A., Inc.,* 130 F.3d 702, 709 (5th Cir. 1997) ("We cannot say that [an employee] can perform the essential functions of the job with reasonable accommodation, if the only successful accommodation is for [the employee] not to perform those essential functions.").

"The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." *E.E.O.C. v. Agro Distribution, LLC*, 555 F.3d 462, 471 (5th Cir. 2009). The Appendix to the ADA regulations explains:

> The accommodation, however, does not have to be the "best" accommodation possible, so long as it is sufficient to meet the job-related needs of the individual being accommodated .... [T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.

29 C.F.R. pt. 1630, App., § 1630.9.

"Under the ADA, it is unlawful for an employer to fail to accommodate the known limitations of an employee's disability." *Griffin*, 661 F.3d at 224. Disability discrimination includes a failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A); *see Austgen v. Allied Barton Sec. Servs., L.L.C.*, 815 F. App'x 772, 774–75 (5th Cir. 2020).

"Under the ADA, once the employee presents a request for an accommodation, the employer is required to engage in the interactive process so that *together* they can determine what

reasonable accommodations might be available." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 622 (5th Cir. 2009). "[R]ecognizing that the responsibility for fashioning a reasonable accommodation is *shared* between the employee and the employer, courts have held that an employer cannot be found to have violated the ADA when responsibility for the breakdown of the informal, interactive process is traceable to the employee and not the employer." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999) (internal citations omitted). The Fifth Circuit "has recognized that where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Chevron Phillips Chem. Co., LP*, 570 F.3d at 621. "Once an employee makes such a request, however, the employer is obligated by law to engage in an "interactive process": a meaningful dialogue with the employee to find the best means of accommodating that disability." *Chevron Phillips Chem. Co., LP*, 570 F.3d at 621.

Having concluded nasal swabbing was an essential element of Hicks' role, the Court turns to whether a reasonable accommodation would have allowed Hicks to perform this essential function. Baylor argues that Hicks refused to accept any of Baylor's proposed accommodations and refused to engage in the interactive process—both of which rendered her unqualified for the position. (ECF No. 50 at 30). In opposition, Hicks alleges that she requested reasonable accommodations twice: "once through the medical exemption, which was granted and no longer applied to the PAT department, and then the accommodation of staying in the chart room." (ECF No. 56 at 46–47). Further, Hicks alleges, she was not the cause of the breakdown in the interactive process, as Baylor "failed to follow its own policies regarding how the interactive process works."

(ECF No. 56 at 47). Hicks further asserts that Baylor completely ignored her request for a reasonable accommodation.

Hicks' arguments have no merit. As a matter of law, she must show that a reasonable accommodation would have allowed her to perform the essential functions of her job—including nasal swabbing. Instead, her only request for a reasonable accommodation was that she continue working in the chart room and not have to swab patients. Fifth Circuit precedent has held that "the law does not require an employer to transfer from the disabled employee any of the essential functions of his job . . . if it is necessary to transfer any of the essential functions to [another employee], then [the disabled employee] is not otherwise qualified." *Barber*, 130 F.3d at 709. "We cannot say that [s]he can perform the essential functions of the job with reasonable accommodation, if the only successful accommodation is for [the employee] not to perform those essential functions." *Barber*, 130 F.3d at 709. Thus, if the only reasonable accommodation Hicks requested was to not perform the essential function, we cannot say she can perform the essential functions of the job with reasonable accommodation, thus, she is not qualified.

Hicks concedes that she did not propose any other potential reasonable accommodations, confirming she chose not to engage in the interactive process.

> Q. So we've been down this list of potential options that you were given. What, if any, accommodation suggestions, Ms. Hicks, did you make to Baylor?
> A. I asked: Could I not just stay where I am in the chart room?
> Q. Did you propose any other potential accommodations that would ---that would allow you to perform the essential functions of your job?
> A. No.

(ECF No. 51 at 33). Hicks further admits that she did not take the HR Business Partner up on his offer to help her look for another position, nor did she inquire about joining the flex pool, or taking a leave of absence. (*See* ECF No. 52 at 38). Additionally, Hicks refused Baylor's post-retirement offer to work in a non-patient facing capacity and she never again looked for work after she retired.

Not only does the evidence overwhelmingly display Baylor's efforts to provide Hicks a reasonable accommodation, but it also points to a unilateral breakdown in the interactive process attributed to Hicks. Baylor attempted to engage in a "meaningful dialogue with [Hicks] to find the best means of accommodating [her] disability," but as Hicks failed to engage—the breakdown is traceable to her. *See Chevron Phillips Chem. Co., LP*, 570 F.3d at 621. Additionally, during the time Baylor was attempting to engage with Hicks in the interactive process, Hicks voluntarily retired. *See Loulseged*, 178 F.3d at 735 (granting judgment as a matter of law in favor of an employer when the employee voluntarily quit—"to hold otherwise would reward [the employee's] unilateral withdrawal from a [process designed for her own benefit").

The record demonstrates that Baylor engaged in the interactive process with Hicks to attempt to fashion a reasonable accommodation for her to continue to work, but Hicks chose not to meaningfully engage, and sought only one accommodation—to relieve her of the essential function of nasal swabbing. The ADA does not require an employer to do so. Hicks fails to show that a reasonable accommodation would have allowed her to perform the essential functions of her job and the Court concludes that Hicks was not qualified under the ADA.

As such, Hicks' disability discrimination and failure to accommodate claims must fail as qualification is an element of the prima facie case of both. The Court pretermits discussion of the remaining elements under both claims, and grants summary judgment in favor of Baylor on Hicks' disability discrimination and failure to accommodate claims.

### IV.   BAYLOR'S MOTIONS TO STRIKE

The Court next analyzes Baylor's motions to strike. Baylor has objected to and moved to strike the following: (i) the expert testimony of Dr. Suneil Koliwad ("Koliwad"), (ECF No. 41);

and (ii) portions of Hicks' summary judgment appendix, (ECF No. 59). The Court hereby denies as moot both motions for the reasons enumerated hereunder.

## A.      Motion to Strike Expert Testimony

Baylor objects to the testimony of Koliwad, contending: (i) he is unqualified to testify as an expert, (ii) such testimony is irrelevant, and (iii) his testimony is unreliable. (ECF No. 41 at 8). Hicks designated Koliwad as an expert witness in this case in her Expert Designation and Disclosures. (ECF No. 37). Because the Court is granting summary judgment as to Baylor on all Hicks' claims, the designation of expert retained by Hicks' is irrelevant and no longer at issue. Thus, Baylor's motion to strike expert testimony is denied as moot.

## B.      Motion to Strike Portions of Hicks' Summary Judgment Evidence

Baylor moved to strike pages 16–38 in Exhibit B of Hicks' summary judgment appendix arguing that it includes selective medical records filed under seal which are not authenticated as required by Fed. R. Evid. 803(6). (ECF No. 59). As one court in the Northern District has discussed in the context of a motion to strike summary judgment evidence:

> Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). .... "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

*Appel v. Inspire Pharms., Inc.*, 712 F. Supp. 2d 538, 542 (N.D. Tex. 2010), *aff'd*, 428 F. App'x 279 (5th Cir. 2011). As another court in the Northern District has discussed in determining summary judgment:

> The court in deciding [movant's] motion will not take into account summary judgment evidence that [movant] has not cited in the manner required—that is, to each page of the appendix that supports each assertion that the party makes concerning the evidence. "Otherwise, [Rule 56.5(c)] would not mean what [it] say[s]." *See Andrews v. CompUSA, Inc.*, 2002 WL 265089, at *3 (N.D.Tex. Feb.21, 2002)(Fitzwater, J.). The court will not undertake a search of the appendix for evidence that would be sufficient to grant summary judgment in [movant's] favor. The court is not required to "comb the record" in search of summary judgment evidence. *See Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir.1996) (citing *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir.1996)). "Nor will the court overlook Rule 56.5(c), a valuable tool for busy trial courts that requires a party to place an issue clearly in focus by citing in its brief *each* page of the appendix that supports *each* assertion that it makes concerning the summary judgment evidence." *Andrews*, 2002 WL 265089 at *3.

*Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, No. CIV.A. 398CV2996D, 2002 WL 1751381, at *9 (N.D. Tex. Apr. 4, 2002). This Court agrees with the *Appel* and *Aspex Eyewear, Inc.* courts' reasoning and applies the same standards to the parties in this case. *See Appel*, 712 F. Supp. 2d at 542; *Aspex Eyewear*, 2002 WL 1751381, at *9. The Court has not considered any evidence that did not meet these standards.

As the Court has considered all of the competent summary judgment evidence before it— without striking any evidence—there is no evidence supporting a finding of any discrimination by Baylor. Even without striking evidence, nothing in the record creates a genuine fact issue that would preclude Baylor's motion for summary judgment. Thus, the Court denies Baylor's motion to strike portions of Hicks' summary judgment appendix as moot.

## V.   CONCLUSION

For the reasons enumerated above, the Court **GRANTS** Baylor's Motion for Summary Judgment, (ECF No. 49), and **dismisses with prejudice** all of Hicks' claims. Additionally, the Court **DENIES AS MOOT** both Baylor's Motion to Strike Expert Testimony, (ECF No. 41), and Baylor's Motion to Strike Portions of Plaintiff's Summary Judgment Appendix. (ECF No. 59). A final judgment will be issued following this memorandum opinion and order.


**SO ORDERED:** July 22, 2024.


Ada E. Brown
UNITED STATES DISTRICT JUDGE